UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 09-418-GWU

RICHARD DURAY DOBBS, PLAINTIFF,

VS. **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The appeal is currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation process in assessing whether a claimant is disabled.

1. Is the claimant currently engaged in substantial gainful activity? If so, the claimant is not disabled and the claim is denied.

2. If the claimant is not currently engaged in substantial gainful activity, does he have any "severe" impairment or combination of impairments--i.e., any impairments significantly limiting his physical or mental ability to do basic work activities? If not, a finding of non-disability is made and the claim is denied.

3. The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of

1

        impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments). If so, disability is conclusively presumed and benefits are awarded.

4.     At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work. If so, the claimant is not disabled and the claim is denied. If the plaintiff carries this burden, a prima facie case of disability is established.

5.     If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

    Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. § 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting

most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. § 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert

accurately portrays the plaintiff's physical and mental impairments.  <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Richard Duray Dobbs, was found by an Administrative Law Judge (ALJ) to have a "severe" impairment due to degenerative changes of the cervical and lumbar spine.  (Tr. 15).  Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that Mr. Dobbs retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits.  (Tr. 16-19).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age of 53, "marginal" education, and work experience as a maintenance repairman, could perform any jobs if he were capable of "light" level exertion with the ability to sit for six hours and stand or walk three hours in an eight-hour day, with a change of positions after 30 minutes, could perform no overhead reaching or climbing of ladders, ropes, or scaffolds, and could occasionally bend, crouch, crawl, balance, use his feet for operation of foot controls, and climb stairs and ramps.  (Tr. 46-8).  The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national

7

economies. (Tr. 47). On appeal, this court must determine whether the administrative decision is supported by substantial evidence.[1]

Mr. Dobbs alleged disability due to a broken neck, bulging discs and spine disease, occurring after an accident on May 20, 2006. (Tr. 116). He stated that he had continued working until August 30, 2006 when he could no longer stand the pain, and a doctor had taken him off work. At the administrative hearing, Mr. Dobbs testified that he could not work because of severe back pain and leg numbness when lifting over five or six pounds. (Tr. 35-6). He also had pain in his neck and numbness in both hands. (Tr. 37-8). His treating physicians, Drs. Foster and Southard, had recommended MRI examinations and he had been able to have two. (Tr. 35). Shortly before the February 15, 2008 hearing, he had fallen in his bathroom and Dr. Southard had recommended a third MRI, for which he was attempting to get financial aid. (Tr. 31-2). Dr. Southard also felt there was something else wrong with his spine. (Tr. 32). He had been using a cane, which his son-in-law had given to him, for almost a year. (Tr. 33).

The records in the court transcript include an observation by a state agency employee at the time Mr. Dobbs made his application that he had difficulty sitting and standing and appeared to be in pain. (Tr. 113-14).

---

[1] Mr. Dobbs evidently filed a subsequent application for benefits following the June 9, 2008 denial decision, and was awarded benefits with an onset date of September 17, 2008. (Tr. 173).

Medical evidence includes an August 31, 2006 office note from Dr. Christine Foster indicating that Mr. Dobbs had fallen into a concrete swimming pool and had severe low back and neck pain. (Tr. 208). Her examination of the plaintiff three months after the injury showed tenderness of the back, limited extension and flexion, along with stiffness, pain, and spasm. (Tr. 208). There was no weakness and only a vague sensory deficit, although Dr. Foster also noted testing that was consistent with carpal tunnel syndrome versus cervical radiculitis. She also assessed lumbar radiculopathy and referred her patient for an MRI. She indicated that he would have to miss "school" for an indefinite period. (Tr. 222).

The MRI was obtained on September 28, 2006 and interpreted by the radiologist as showing an abnormal cord from C5 to T1, which was said to need further evaluation with contrast, a fusion of the C2 and C3 vetrebrae, fusion anomalies at the base of the skull, "severe" spondylotic changes at C5 through C7 resulting in severe and moderate flattening of the spinal cord with bilateral stenosis, a large bulge at L2-L3 producing marked effacement of the sac, a bulging disc producing compression of the L5 ganglia, and bulges at L1-L4 without neural impingement. (Tr. 191-3). On reviewing the results of the MRI, Dr. Foster recommended a cervical spine MRI with contrast and a neurosurgical consultation. (Tr. 211). The MRI with contrast was interpreted as showing "enhancement" in the lower cervical cord which was probably related to "multiple congenital anomalies

9

and intrinsic cord abnormalities." (Tr. 197). The radiologist felt that he could not exclude a "primary neoplasm." (Id.).

Mr. Dobbs obtained a neurosurgical consultation from Dr. Magdy El-Kalliny on November 14, 2006. Dr. El-Kalliny agreed that the MRIs showed an osteophyte complex from C4 to C6 causing "some left foraminal stenosis" at these levels, but with no evidence of instability, and multilevel degenerative disc disease of the lumbar spine without disc herniation, nerve root compression, or spinal canal stenosis. (Tr. 204). His physical and neurological examinations were essentially normal with no weakness, significant lumbar tenderness, or spasm. (Id.). Dr. El-Kalliny recommended physical therapy and if this was not effective, referral to a pain clinic for pain management. (Id.).

Mr. Dobbs reported to Dr. Foster in December, 2006, that he had been denied workers compensation, did not have any health benefits, and could not afford the recommended physical therapy or pain management. (Tr. 226). Dr. Foster's examination showed an abnormal range of motion of the neck, tenderness and spasm of the trapezius, and back tenderness with limited flexion and extension. (Tr. 226, 235). Her neurological evaluation was normal. She prescribed medications. (Id.). In April, 2007, Dr. Foster signed a form indicating that Mr. Dobbs was "permanently and totally disabled and will never be gainfully employed." (Tr. 267).

Dr. Martin Fritzhand conducted a consultative examination of Mr. Dobbs on November 7, 2007 and reviewed the MRI reports.  His examination showed an elevated blood pressure and noted that the plaintiff had a depressive aspect and appeared to be markedly tremulous. (Tr. 255).  He noted that Mr. Dobbs was using a cane but could walk without it.  (Id.).  His examination showed a diminished sensation to pinprick and light touch in the upper extremities but with muscle and grasp strength well preserved. (Id.).  He could walk on his heels and toes and walk heel to toe and bend forward 85 degrees with slight difficulty.  He had some difficulty standing on either leg and could squat to 50 percent of standard.  Lateral bending was diminished and he said he could not extend at the waist.  Straight leg raising was positive at 50 degrees, the hip range of motion was slightly diminished, and pinprick and light touch was diminished over the right leg, part of the left lower leg, and the entire left foot. (Tr. 255-6).  Reflexes were normal.  Dr. Fritzhand listed his impression as including degenerative joint disease of both the cervical and lumbar spine, and added that Mr. Dobbs was "extremely depressed" to the extent that he suspected daily activities and interests would be restricted.  (Id.).  He prepared a physical functional capacity assessment "[b]ased on the findings of this orthopedic examination" which concluded that Mr. Dobbs could lift 20 pounds occasionally and 10 pounds frequently, sit six hours (no more than two hours without interruption) and stand and walk three hours each (no more than 30 minutes without interruption) in an eight-hour day. (Tr. 256, 260-1).  He could occasionally reach overhead and

operate foot controls, stoop, kneel, crouch, and crawl, but could never climb stairs, ramps, ladders, scaffolds, or balance. (Tr. 262-3). Mr. Dobbs was capable of frequently reaching, feeling, pushing, and pulling and working around moving mechanical parts, humidity, wetness, dust, odors, fumes, and pulmonary irritants, extremes of temperature and vibrations; he could also "frequently" operate a motor vehicle.[2] Interestingly, although Dr. Fritzhand indicated that Mr. Dobbs did require the use of a cane to ambulate, he stated that he did not know if it was medically necessary and that he could walk 30 to 50 yards "or more?" without it. (Tr. 261). Despite this equivocation regarding the need for the cane, he indicated that the plaintiff could "occasionally" work at unprotected heights. Finally, he added that Mr. Dobbs was "<u>profoundly</u> depressed affecting all studies." (Tr. 265) (emphasis in original).

Apparently due to the departure of Dr. Foster, Mr. Dobbs began seeing Dr. Stephanie Southard in the same medical office as an "established patient." (Tr. 269).[3] In an October, 2007 examination, Dr. Southard noted marked tenderness of the perispinal musculature in the cervical and lumbar area and a limited range of motion due to pain and spasm. (Id.). She prescribed medications including Tylenol

---

[2]"Occasionally" is defined as up to one-third of the time and "frequently" was defined as one-third to two-thirds of the time. (Tr. 262-4).

[3]Neither the ALJ or the Commissioner claim that Dr. Southard was not a treating source.

No. 3, Neurontin, and Baclofen. (Tr. 270). On January 2, 2008, Mr. Dobbs reported that his pain had become worse two weeks previously and that when he had any pressure on his back at all his legs and groin would go numb. (Tr. 275). After standing for a few minutes a few days previously, his legs had given out, causing him to fall, and he had difficulty getting up. He also felt as though he was losing control over his bowels. (Id.). Dr. Southard's examination showed a moderately severe spasm of the neck, with limited range of motion, spinal tenderness, and limited range of motion but no neurological deficits. She assessed cervical and lumbar disc disorder with myelopathy, and told Mr. Dobbs it was necessary to repeat the MRI and he needed to see if he qualified for a patient assistance program to obtain it. (Tr. 276).

Dr. Southard completed a functional capacity questionnaire on February 3, 2008 limiting the plaintiff to less than full-time walking, sitting, and standing, lifting no more than 10 pounds occasionally, "never" performing any postural activities, and, in addition, found that he needed to avoid unprotected heights, vibration, and moving machinery and could not use his hands or feet for repetitive work activities. (Tr. 277-8).[4] The ALJ stated that he declined to accept the disability statement from

---

[4] Evidence submitted to the Appeals Council shows that Mr. Dobbs eventually did obtain additional MRIs of the cervical and lumbar spine on August 1, 2008, after the date of the ALJ's decision, which showed, among other items, a probable "extending extrusion versus free fragment" at L5-S1 and a suggestion of "mild malacia secondary to multilevel spinal stenosis and discogenic degenerative changes," with a neurosurgical consultation recommended. (Tr. 280-2). Evidence which was not available to the ALJ is

Dr. Foster and the functional capacity assessment from Dr. Southard because they were not supported by clinical findings or diagnostic testing "which revealed no disc herniation or nerve root impingement," and because they were vague as to the degree of functional limitation. He contrasted the limitations unfavorably with Dr. El-Kalliny's findings that there was no neurological impairment and found them to be inconsistent with Dr. Fritzhand's consultative examination. As a result, the ALJ stated that he had based his functional capacity assessment on Dr. Fritzhand. The plaintiff objects to these findings as giving insufficient weight to the treating sources, particularly to Dr. Southard.

The court notes that, whatever else might be said on the subject of the weight given to the treating sources, the ALJ's functional capacity assessment is inconsistent with both Dr. Fritzhand and Dr. Southard in finding that the plaintiff could occasionally climb ramps and stairs and balance. Both of the physicians stated that he could "never" balance, or climb ramps and stairs. (Tr. 263, 278). Social Security Ruling (SSR) 83-14 notes that a limitation of ability to maintain body equilibrium can affect the capacity to perform jobs at all levels of physical exertion. SSR 83-14, p. 2.[5] Therefore, it is uncertain whether the VE's testimony in response

---

not part of the court's substantial evidence review, however.

[5]SSR 85-15, applicable to claimants with solely non-exertional impairments, notes that "[l]imitations in climbing and balancing can have varying effects on the occupational base, depending on the degree of limitation and the type of job. Usual everyday activities, both at home and at work, include ascending and descending ramps and

to the hypothetical question is accurate, and since the ALJ provided no rationale for departing from the restrictions listed by both the only examining and treating sources to offer an opinion, a remand will be required for further consideration.

The plaintiff additionally maintains that the ALJ gave an inadequate rationale for failing to accept the opinion of the treating source, Dr. Southard. Generally, the opinion of a treating source is entitled to great weight, and may be entitled to controlling weight if it is supported by objective evidence and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); Rogers v. Commissioner of Social Security, 486 F.3d 234, 242 (6th Cir. 2007).

The plaintiff attacks the ALJ's reasoning for rejecting Dr. Southard's report, arguing that it was supported by her abnormal clinical findings and by those of Dr. Fritzhand, as well as one of the radiologists who noted that the abnormalities could account for Mr. Dobbs' extremity symptoms. (Tr. 228). The plaintiff notes that it is possible to have severe pain without having a herniated disc or neurological symptoms, and in this light the examination of Dr. El-Kalliny, who was seeing Mr. Dobbs primarily to determine if he had a surgically correctible condition, was not inconsistent with Dr. Southard in view of the fact that he suggested the possibility of pain management.[6] It would be appropriate, on remand, for the ALJ to give a

---

maintaining body equilibrium while doing so." SSR 85-15, p. 6.

[6]The plaintiff cites Hensley v. Commissioner of Social Security, 573 F.3d 263 (6th Cir. 2009), in which the Sixth Circuit remanded an ALJ decision because the rationale

15

more detailed explanation of these points, and the factors outlined in 20 C.F.R. § 404.1527.

Finally, although the ALJ did not err in finding no severe mental impairment, he gave no explanation for totally ignoring the explicit evidence from Dr. Fritzhand that the plaintiff's "profound" depression was affecting all his "studies" in determining the RFC. Once one severe impairment is found, the combined effect of all impairments must be considered, even those which would not be considered "severe" on their own. 20 C.F.R. §§ 404.1523; 404.1545(a)(2).

The decision will be remanded for further consideration.

This the 31st day of August, 2010.

Signed By:

*G. Wix Unthank*

**United States Senior Judge**

---

given for rejecting the treating source was nothing more than a conflicting opinion by a one-time examiner. Id. at 266. Hensley is not apposite to the current action because a fair reading of the ALJ's decision is that he found that more than one physician's opinion conflicted with the treating source, and also that Dr. Southard's findings themselves did not support her restrictions.